NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KIALISSESHA G. SANTANA,<br><br>               Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>               Defendant. | Civil Action No. 20-3125 (SDW)<br><br>**OPINION**<br><br>June 30, 2021 |

**WIGENTON**, District Judge.

Before this Court is Plaintiff Kialissesha G. Santana's ("Plaintiff") appeal of the final administrative decision of the Commissioner of Social Security (the "Commissioner") with respect to Administrative Law Judge Myriam C. Fernandez Rice's ("ALJ Fernandez Rice") denial of Plaintiff's claim for supplemental security income ("SSI") under the Social Security Act (the "Act"). This Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Venue is proper pursuant to 28 U.S.C § 1391(b). This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure ("Rule") 78. For the reasons set forth below, this Court finds that ALJ Fernandez Rice's factual findings are supported by substantial evidence and that her legal determinations are correct. Therefore, the Commissioner's decision is **AFFIRMED**.

## I.    PROCEDURAL AND FACTUAL HISTORY

### A.  Procedural History

On November 3, 2016, Plaintiff's mother filed for SSI on Plaintiff's behalf, alleging disability because of scoliosis, depression, and anxiety.[1] (D.E. 5, Administrative Record ("R.") 161.) The claim was initially denied on January 9, 2017, (R. 83-85), and upon reconsideration on April 18, 2017. (R. 89-92.) Plaintiff was granted a hearing before ALJ Fernandez Rice to review her application *de novo*, which was held by video on October 11, 2018. (R. 93-95; R. 31-62.) ALJ Fernandez Rice denied Plaintiff's application on January 3, 2019, finding that Plaintiff's impairments were not medically or functionally equivalent to the Commissioner's child listings. (R. 10-30.) Plaintiff sought Appeals Council review, (R. 141-42), which was denied on January 24, 2020. (R. 1-5.) Plaintiff is now at the age of majority and is pursuing the claim on her own behalf. (D.E. 12, ("Pl. Br.") at 1.) Plaintiff appealed on March 22, 2020. (Compl.) All briefing was timely filed. (D.E. 13.)

**B. Factual History**

Plaintiff is a nineteen-year-old resident of Lodi, New Jersey, who previously lived with her mother and brother. (R. 16, 38, 83, 144.) At the time of her hearing, she was in eleventh grade at Lodi High School, where she had been enrolled since ninth grade. (R. 37.) Plaintiff performed well in school, earning A's and B's on her 2016-17 report card and standardized test scores that "exceeded expectations" in English Language Arts, (R. 178), and "met expectations" in Mathematics. (R. 180.) Plaintiff received largely positive feedback from her teachers, who noted that Plaintiff "effectively prepares for quizzes, tests, and assignments," "focuses on work," and "asks for help when needed." (R. 177.) The only negative feedback that Plaintiff received was

---

[1] Although Plaintiff's Complaint refers to Attention Deficit with Hyperactivity Disorder ("ADHD") as one of her serious impairments, (D.E. 1 "Compl." ¶ 4), Plaintiff's ADHD did not serve as a basis for her SSI application. (*See* R. 161.)

2

from her gym teacher, who said that she was "not yet meeting performance expectations for this course." (*Id*.)

On December 7, 2016, Joe Manzo and Catherine Curry completed a Teacher Questionnaire, which indicated that Plaintiff was able to acquire and use information, was independent in classwork, did not need extra help except for direction clarification, and could move about and manipulate objects. (R. 167-74.) The questionnaire also stated that Plaintiff had a "flat affect" and slight problems refocusing to task when necessary, completing work accurately without careless mistakes, paying attention when spoken to directly, and finishing tasks on time. (R. 169, 172.) In addition, although Plaintiff had friends in her age group, she demonstrated some problems interacting with and relating to others and was reluctant to participate in classroom activities. (R. 169-70.) Plaintiff also demonstrated: slight problems with caring for her physical needs and knowing when to ask for help; obvious problems with handling frustration appropriately, being patient when necessary, and using appropriate coping skills to meet the daily demands of her environment; and very serious problems identifying and appropriately asserting her emotional needs and responding appropriately to changes in her own mood. (R. 172.)

On September 7, 2018, Plaintiff was deemed eligible for a Section 504/Americans with Disabilities Act Student Accommodation Plan ("504 Plan"). (R. 233.) That plan noted that Plaintiff had a "severe anxiety disorder with panic attacks" that could impact her academic performance. (*Id.*) The 504 Plan accommodations enabled Plaintiff to elect not to partake in group projects, to participate in class on a volunteer basis only, and to be excused from class to visit the school nurse or take a brief walk when necessary. (R. 234.)

**C. Medical Evidence**

    **1. Scoliosis**

On April 14, 2016, Dr. Katrina Munteanu examined Plaintiff and advised her to visit an orthopedist to further assess her scoliosis, which was "fairly severe." (R. 248, 256.) On April 27, 2016, Plaintiff and her mother visited an orthopedist, Dr. Douglas Avella, who noted that Plaintiff complained of mid-back pain but denied tingling, numbness, paresthesia, and weakness. (R. 236.) Her physical examination demonstrated a "very large and worrisome" right thoracic hump and her thoracic range of motion was limited with respect to twisting. (R. 237.) However, Plaintiff was able to stand straight and her lower extremities were symmetrical. (*Id*.) Dr. Avella prescribed Plaintiff physical therapy and suggested that Plaintiff receive an MRI of her entire spine because her curve was "somewhat atypical" with "borderline surgical indications." (R. 237-38.) If the MRI came back normal, he recommended conservative treatment and monitoring. (R. 238.)

### 2. Depression, Anxiety, and ADHD

Notes from Plaintiff's April 14 appointment with Dr. Munteanu also discuss mental health concerns including anxiety, depression, and inattention.[2] (R. 248-58.) Dr. Munteanu observed that Plaintiff was healthy but had a "shut down affect" and was not automatically responsive when greeted. (R. 251.) Plaintiff's mother reported concerns that Plaintiff did not pay attention when spoken to and would sometimes stare into space. (*Id.*) Plaintiff stated that she did not participate in sports or clubs, had trouble falling asleep, and ate an unhealthy diet. (R. 251-52.) Dr. Munteanu referred Plaintiff to a neurologist and noted that Plaintiff could be suffering from a developmental delay, mild autism, or simply an introverted personality. (*Id.* at 256.)

---

[2] On June 22, 2016, Dr. Jaclyn Fallon examined Plaintiff and noted that Plaintiff had reported seeing an orthopedist, who said that her scoliosis would resolve on its own and that no follow-up was needed. (R. 259; *see also* R. 79.)

On October 29, 2016, Dr. Munteanu also reported that Plaintiff had visited an orthopedist who said that her scoliosis was "mild." (R. 263.) During this visit, Plaintiff presented with a "very slouched posture" and complained of back pain, but she had not taken action to alleviate her discomfort. (R. 263-64.) At that time, Plaintiff's mother had not followed up with the orthopedist and could not remember his name. (R. 263.)

4

On or around June 24, 2016, Dr. Robert Connors examined Plaintiff for a neurological consultation, performed a twelve-point system review, and noted that Plaintiff had depression, was fidgety, and had some difficulty speaking clearly. (R. 239-40.) Dr. Connors reported that Plaintiff spent most of her free time reading, writing, and participating in an online group about fantasy novels. (*Id*.) Plaintiff denied crippling affective symptoms and sleep disturbances. (*Id*.) Dr. Connors also noted that although Plaintiff's command of verbal communication was imperfect and she had a history of some language delays, her development was "notable" for a late acquisition of language. (*Id.*) Plaintiff's mother told Dr. Connors that Plaintiff picked at her skin, excessively blinked her eyes, and occasionally hand-tapped. (*Id.*) However, Plaintiff said that she could stop the movements, which increased in frequency when she was anxious. (*Id.*) Dr. Connors' overall impression was that Plaintiff had an "unusual degree of social isolation certainly suggestive of Asperger's disorder and co-morbid motor disorder." (*Id*. at 241) His differential diagnosis included affective disorders, and he recommended specific treatment for Plaintiff's anxiety and a cursory neurological workup, including an MRI. (*Id*.)

On August 25, 2016, Dr. Connors administered an electroencephalogram ("EEG") to Plaintiff with normal results. (R. 243-44.) Subsequently, Dr. Connors saw Plaintiff for a follow-up visit on October 6, 2016 and noted that she had no additional symptoms but had not improved. (R. 246.) His differential diagnosis did not significantly change from the first visit, but he reported that he slightly favored an affective disorder over an autism spectrum disorder, although he did not think that either applied perfectly. (R. 247.) He again advised Plaintiff to obtain an MRI and attend counseling. (*Id.*) He was not averse to pharmacological treatment but advised Plaintiff to first begin a relationship with a clinical therapist. (*Id.*)

5

Plaintiff visited Care Plus New Jersey for psychiatric treatment and counseling on numerous occasions between October 2016 and October 2018. (R. 286-349.) Plaintiff and her mother first visited Care Plus New Jersey to seek mental health services on October 26, 2016, where Dr. Charles Kim examined Plaintiff. (R. 274, 321.) Dr. Kim established treatment goals for Plaintiff, including becoming more comfortable expressing herself and working to identify the underlying causes for her anxiety. (*Id.* at 274.) Plaintiff reported past suicidal ideations and presented with self-injurious behavior and sleep disturbances, with a guarded attitude, dysphoric mood, flat affect, decreased appetite, and limited insight. (R. 275-76, 281-82.) Otherwise, her risk factors were normal. (*Id.*) After this appointment, Dr. Kim wrote a note to Plaintiff's school stating that Plaintiff struggled with a severe anxiety disorder with panic attacks and suggesting that she be excused from all group projects and be allowed to leave class to go to the nurse's station to recover from anxiety attacks. (R. 321.)

Plaintiff's examinations typically indicated normal results apart from social isolation, anxiety, and depressive symptoms, which often arose in response to internal pressure to perform well in school and negative feedback from her mother. (R. 267, 293, 306-15, 336-37, 345, 354-56, 362-64, 372.) Occasionally, Plaintiff reported "distractable" attention and difficulty falling asleep. (*Id.*). Plaintiff also stated that she struggled interacting with strangers. (R. 349.) In December 2016, Plaintiff was prescribed medications for her depression, anxiety, and ADHD. (R. 218, 300.) Plaintiff reported that her symptoms worsened when her mother did not purchase certain medications. (R. 315, 357.) However, in appointments between May and July 2017, Plaintiff reported feeling better when she interacted with her friends and acknowledged that she was able to develop coping mechanisms to combat some of her anxious behaviors. (R. 360, 368, 372.) Plaintiff's mother was often present during these sessions. (R. 354.) On May 30, 2018,

Plaintiff's mother reported that Plaintiff had received a dog as a gift, which made Plaintiff happier and more social. (R. 344.) At Plaintiff's subsequent follow-up on October 4, 2018, Dr. Tanya Lewis noted that Plaintiff had largely been without medications during the summer. (R. 338.)

### 3. State Agency Examinations

State agency experts Samuel Kaye, Durga Gaviola, and Cheryl Sanford reviewed Plaintiff's medical records on December 27, 2016, April 4, 2017, and April 17, 2017, respectively. (R. 67-68, 77-82.) Dr. Kaye found that Plaintiff's scoliosis was severe but did not meet, medically equal, or functionally equal the listings. (R. 68.) Dr. Gaviola found that Plaintiff had no physical limitations due to the scoliosis and affirmed the prior child disability evaluation. (R. 79.) Dr. Sanford concluded that Plaintiff had no "discrete psychiatric medically determinable impairment," and noted that although Plaintiff experienced anxiety associated with her scoliosis, this appeared to be an "appropriate response to concern about her physical appearance and response by others." (*Id.*) Dr. Sanford also noted that Plaintiff performed well in school. (*Id.*)

### D. Function Reports

Plaintiff's function reports, dated October 31, 2016 and March 5, 2017, noted that, although she could walk, she did not run, dance, swim, drive a car, ride a bicycle, throw a ball, jump rope, play sports, or work video game controls. (R. 153, 203-04.) The reports also asserted that Plaintiff had difficulty, *inter alia*, answering the phone and making calls, taking care of her personal hygiene, washing and putting away clothing, helping around the house, cooking a meal for herself, using public transportation by herself, and accepting criticism or correction.[3] (R. 152-56, 205-07.) Plaintiff's 2017 function report also stated that Plaintiff had difficulty making new friends, getting

---

[3] There were several discrepancies between the two function reports. (*Compare* R. 153 *with* R. 203; *compare* R. 155 *with* R. 207.)

along with adults, playing team sports, reading, understanding written sentences, telling time, making correct change, and understanding simple instructions. (R. 203-05.)

**E. Hearing Testimony**

Plaintiff and her mother testified at the hearing before ALJ Fernandez Rice. (R. 31-62.) Plaintiff testified that when she is home, she spends her time babysitting her brother, doing homework, reading, or watching videos. (R. 38-39, 48.) She stated that she preferred not to interact with her brother and mother and did not like going anywhere outside of the house, although her mother would sometimes "make her" go grocery shopping. (R. 49-52.) However, she said that she occasionally enjoyed having friends over. (*Id.*)

Plaintiff also testified that she had several friends at school, enjoyed her English class, and got along well with a few of her teachers. (R. 39.) Plaintiff reported that she received mostly "A's" in her classes and that, while she had a 504 Plan in school, she did not like to use the accommodations because of her fear of her classmates' reactions. (R. 40-44.) Plaintiff stated that when she would have panic attacks in class, one of her peers would inform the teacher, and the teacher would send her to the nurse's office. (R. 42-43.) Plaintiff said that she started seeing a psychiatrist for her depression during her last year of middle school but that it was "not . . . therapy." (R. 46-47.)

Plaintiff's mother testified that she felt that Plaintiff could not do anything independently because of her depression and anxiety. (R. 53, 59.) Plaintiff's mother said that she was called to Plaintiff's school every week to pick her up because of her panic attacks and that Plaintiff tried to be excused from her gym class because she disliked being around people. (R. 53-54.) Plaintiff's mother also stated that Plaintiff spent many hours doing her homework every night because she felt pressure to perform well, continuously picked at her skin, and had difficulty focusing and

finishing her chores. (R. 54-58, 61.) She further testified that Plaintiff used to see a therapist, but her work scheduled interfered with regularly bringing Plaintiff to appointments. (R. 58-59.)

## II. LEGAL STANDARD

### A. Standard of Review

In Social Security appeals, this Court has plenary review of the legal issues decided by the Commissioner. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). Yet, this Court's review of the ALJ's factual findings is limited to determining whether there is substantial evidence to support those conclusions. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).

Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted). Thus, substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'" *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x. 613, 616 (3d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Importantly, "[t]his standard is not met if the Commissioner 'ignores, or fails to resolve, a conflict created by countervailing evidence.'" *Bailey*, 354 F. App'x. at 616 (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). However, if the factual record is adequately developed, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Daniels v. Astrue*, No. 4:08-cv-1676, 2009 WL 1011587, at *2 (M.D. Pa. Apr. 15, 2009) (internal quotation marks omitted) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). "The ALJ's decision may not be set aside merely because [a reviewing court] would have reached a different decision." *Cruz v. Comm'r of Soc. Sec.*, 244 F. App'x. 475, 479 (3d Cir. 2007) (citing *Hartranft*, 181 F.3d at 360). This Court is required to give

substantial weight and deference to the ALJ's findings. *See Scott v. Astrue*, 297 F. App'x. 126, 128 (3d Cir. 2008). Nonetheless, "where there is conflicting evidence, the ALJ must explain which evidence he accepts and which he rejects, and the reasons for that determination." *Cruz*, 244 F. App'x. at 479 (citing *Hargenrader v. Califano*, 575 F.2d 434, 437 (3d Cir. 1978)).

In considering an appeal from a denial of benefits, remand is appropriate "where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits." *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) (internal quotation marks omitted) (quoting *Saldana v. Weinberger*, 421 F. Supp. 1127, 1131 (E.D. Pa. 1976)). Indeed, a decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny v. Harris*, 745 F.2d 210, 221–22 (3d Cir. 1984) (citations omitted).

### B. The Three-Step Child Disability Test

A claimant's eligibility for Social Security benefits is governed by 42 U.S.C. § 1382. An individual under the age of eighteen will be considered disabled under the Act if she (1) is not engaged in substantial gainful activity and (2) has a medically determinable physical or mental impairment that results in marked and severe limitations, and which can be expected to result in death or which has lasted for a continuous period of not less than twelve months. 42 U.S.C. 1382c(a)(3)(C)(i). A claimant must show that the "medical signs and findings" related to her ailment have been "established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the

pain or other symptoms alleged . . . . and which would lead to a conclusion that the individual is under a disability." 42 U.S.C. § 423(d)(5)(A).

The SSA has established a three-step sequential process to evaluate the disability of an individual under the age of eighteen. 20 C.F.R. § 416.924(a). In step one, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. If the claimant is currently engaged in substantial gainful activity, then she is not disabled, and the claim is denied. *Id.* If she is not engaged in substantial gainful activity, then the ALJ proceeds to step two.

In step two, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. § 416.924(c). If the claimant does not have such an impairment or impairments, then the ALJ will find she is not disabled. *Id.* If she does, the ALJ will proceed to step three, where it must be determined whether the claimant has an impairment or combination of impairments that meets or medically equals the severity of an impairment in the Listings, found in 20 C.F.R. § 404, Subpart P, App. 1, or that functionally equals a listed impairment. 20 C.F.R. § 416.926(a). In making this determination, the ALJ must assess the claimant's function in the following six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926(a)(b)(1).

An impairment or combination of impairments functionally equals a Listing if it results in a "marked" limitation in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926(a)(b)(1)(i–v). A "marked" limitation in a domain is one that "interferes seriously" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926(a)(e)(2)(i). An extreme limitation is one that "interferes very seriously" with the ability

11

to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926(a)(e)(3)(i). To determine the degree of limitation, the ALJ must consider the intensity and persistence of the claimant's symptoms. 20 C.F.R. § 416.929(c)(1). The ALJ must consider all available evidence including: the claimant's history, signs and laboratory findings, medical opinions, and statements from the claimant, his treating source, and other persons about the effect of the symptoms on the claimant. *Id.* If the claimant's impairment meets or equals an impairment in the Listings, and meets the duration requirement, disability is presumed, and benefits are awarded. 20 C.F.R. § 416.924(d). When the claimant's impairment does not meet or equal an impairment in the Listings, or does not meet the duration requirement, the individual is not disabled and the claim is denied. 20 C.F.R. § 416.924(d)(2).

### III. DISCUSSION

#### A.

On January 8, 2019, ALJ Fernandez Rice issued a decision concluding that Plaintiff was not disabled. (R. 10-27.) At steps one and two of the analysis, the ALJ determined that Plaintiff had never engaged in substantial activity and exhibited the following severe impairments: scoliosis, attention deficit with hyperactivity disorder, depression, and anxiety. (R. 16.)

At step three, the ALJ found that Plaintiff's impairments, individually and in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1.[4] (*Id.*) The ALJ concluded that Plaintiff was able to acquire and use information. (R. 18-19 (reviewing the medical evidence, testimony regarding school performance, Teacher Questionnaire, and function reports).) The ALJ also determined that Plaintiff had less-than-marked limitations in the area of attending and completing tasks because she did not exhibit severe behavioral problems in school or difficulty concentrating on her schoolwork. (R. 19-21.) In addition, the Teacher Questionnaire indicated that Plaintiff did not have difficulty carrying out multi-step instructions, sustaining attention during play, waiting to take turns, changing from one activity to another, organizing her materials, or completing her work without distraction. (R. 20.)

The ALJ further found that, despite her scoliosis, Plaintiff did not demonstrate any limitations related to moving or manipulating objects. (R. 23 (relying on the Teacher Questionnaire and pediatrician examinations).) Given the conflicting evidence in the record, the ALJ deemed the function reports to be unpersuasive. (R. 24.) Similarly, the ALJ concluded that Plaintiff had no limitations in caring for herself. (R. 25 (noting that Plaintiff's skin picking improved with therapy, she reported normal sleep and enjoyment in activities, and the Teacher Questionnaire indicated that she did not exhibit personal hygiene concerns).)

The ALJ also determined that Plaintiff had less than marked limitations in the area of health and physical wellbeing.[5] (R. 26 (relying on Plaintiff's testimony regarding her grades and

---

[4] The ALJ determined that Plaintiff's scoliosis did not meet or medically equal the requisite listing criteria because there was no evidence of a nerve root or spinal cord compromise characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss, or a positive straight leg raising test. (R. 16.) Plaintiff's depressive disorder also fell below the necessary severity because she did provide medical documentation of five or more of the requisite criteria. (R. 16-17.) Nor did Plaintiff display an extreme limitation of one or a marked limitation of two of the following areas of mental functioning: understanding; remembering or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing herself. (R. 17.) In addition, Plaintiff's anxiety disorder did not document one or more of the following: restlessness, easily fatigued, difficulty concentrating, irritability, muscle tension, or sleep disturbance; nor was there medical documentation of a panic disorder, agoraphobia, or obsessive-compulsive disorder. (*Id.*)

[5] Again, the ALJ found Plaintiff's mother's statements and function reports unpersuasive because of their inconsistency with the record, which described the fact that Plaintiff was allowed to babysit her brother, alongside Plaintiff's mother's failure to follow through with treatments. (R. 26-27.)

activities at home, 504 Plan school records, and the state agency pediatricians' opinions).) Plaintiff's limitation as to interacting with and relating to others was deemed marked because she had difficulty initiating and sustaining emotional connections. (R. 22-23 (relying on Plaintiff's function reports and notes from Care Plus New Jersey).) However, the ALJ also noted that Plaintiff could speak intelligibly and verbally communicate with others. (*Id.* (relying on the Teacher Questionnaire, which stated that Plaintiff largely did not have difficulty getting along with her peers, although she had a slight problem making and keeping friends and obvious problems with communication and expression of emotion).)

**B.**

Plaintiff appeals the ALJ's decision on two grounds: (1) that the medical equivalence discussion failed to provide a basis upon which judicial review is possible, in part because it did not discuss Plaintiff's limitations "in combination," and (2) that the functional equivalence analysis was determined based on a selective presentation of the record evidence. (Pl. Br. 6, 16.) Neither argument provides a basis for disturbing the ALJ's conclusions.

First, as to Plaintiff's argument that the ALJ failed to consider her limitations "in combination," the decision was sufficiently developed to "allow for meaningful review." *Padilla v. Comm'r of Soc. Sec.*, Civ. No. 09-2897, 2010 WL 2346650, at *5 (D.N.J. June 9, 2010) (dismissing a similar "combination" argument where the ALJ's analysis was clearly distinguishable from the conclusory *Burnett* and *Torres* analyses); *Wright v. Comm'r of Soc. Sec.*, Civ. No. 15-3965, 2016 WL 5852854, at *9 (D.N.J. Oct. 4, 2016) (same). It is well-established that "*Burnett* 'does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.' Instead, the Third Circuit has counseled the district courts to look at the decision as a whole to determine whether the ALJ considered the appropriate factors at Step

Three. Here, [the ALJ's] careful analysis of the medical evidence . . . was comprehensive enough for meaningful review." *Id*. (internal citations omitted).

The remainder of Plaintiff's arguments are either vague or meritless. Plaintiff does not provide additional or overlooked evidence to illuminate how her conditions meet or medically equal all of the criteria of a specific listing, but instead merely reiterates general challenges to the findings. (Pl. Br. 6-15.) The decision clearly demonstrates that the ALJ thoroughly reviewed the record evidence in making her determination that Plaintiff was not disabled. (*See* R. 18-27.) The denial noted that, despite the many medical opinions in the record, none concluded that Plaintiff's impairments met or equaled a listing. (R. 26.) Further, there were profound inconsistencies between Plaintiff's mother's testimony and the medical evidence including, *inter alia*, Plaintiff's physical limitations and ability to focus on tasks such as homework. (R. 25-27.) Although Plaintiff avers that her ability to interact with others should have been labeled as "extreme," the ALJ cited specific evidence as to why Plaintiff's limitation was only marked, including the Teacher Questionnaire and therapy session notes, which demonstrated a significant amount of function in this area. (*See* R. 22-23.) As to Plaintiff's arguments regarding her ADHD, they are unpersuasive, in part because ADHD was not listed as a basis of disability in her underlying application for SSI.[6] (R. 74.)

---

[6] Even if Plaintiff had originally listed ADHD as one of her disabilities, to demonstrate disability under Listing 112.11, a claimant must provide evidence of the following: one or both of frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks; or hyperactive and impulsive behavior; significant difficulties learning and using academic skills; or recurrent motor movement or vocalization; in addition to extreme limitation of one or marked limitation of two of the following areas of mental functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself. C.F.R. Pt. 404, Subpt. P. Appx. 1, § 112.11. As the ALJ noted in her decision, Plaintiff did not have *any* extreme limitations and only showed marked limitations with respect to interacting with others. (R. 22.) On that basis, Plaintiff would not have met the Commissioner's Listing for ADHD. *Cf. A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp. 3d 512, 520-22 (D.N.J 2016) (remanding a denial of SSI in a child disability case when the ALJ entirely neglected the child's ability to initiate, sustain, and complete activity and ignored recent reports of the child's struggles in school).

Second, nothing in the ALJ's comprehensive discussion of the evidence compels reversal. The ALJ properly assessed and weighed the medical evidence and testimony before her, including three years of records from Plaintiff's psychiatric and psychological care, notes from her neurologist and orthopedist, the Teacher Questionnaire, and various function reports. (*See* R. 18-27.) Because the ALJ considered the record evidence and gave Plaintiff's subjective complaints "serious consideration," but found those subjective complaints unpersuasive, this Court will not disturb her conclusions. *Rowan v. Barnhart*, 67 Fed. App'x. 725, 729 (3d Cir. 2003).

## IV. CONCLUSION

Because this Court finds that ALJ Fernandez Rice's factual findings were supported by substantial credible evidence in the record and that her legal conclusions were correct, the Commissioner's decision is **AFFIRMED**. An appropriate order follows.

s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig: Clerk
cc: Parties